1

2

3

4

5

6                  IN THE UNITED STATES DISTRICT COURT FOR THE

7                       EASTERN DISTRICT OF CALIFORNIA

8

9   SIERRA FOOTHILLS PUBLIC        )        No. CV-F-05-0736 REC LJO
    UTILITY DISTRICT,              )
10                                 )        ORDER GRANTING SFPUD'S
                   Plaintiff,      )        MOTION FOR PARTIAL SUMMARY
11                                 )        JUDGMENT AND DENYING
            vs.                    )        CLARENDON'S MOTION FOR
12                                 )        SUMMARY JUDGMENT.
    CLARENDON AMERICA INSURANCE    )
13  CO., and Does 1 through 100,   )        (Docs. 30 & 41)
    inclusive,                     )
14                                 )
                   Defendants.     )
15                                 )
    _____    )
16

17

18       On Monday, May 8, 2006, the Court heard Sierra Foothills

19  Public Utility District's ("SFPUD") Motion for Partial Summary

20  Judgment as to the Issue of Clarendon's Duty to Defend and

21  Clarendon America Insurance Company's ("Clarendon") Motion for

22  Summary Judgment.  Upon due consideration of the written and oral

23  arguments of the parties and the record, the Court GRANTS SFPUD's

24  motion and DENIES Clarendon's motion, as set forth herein.

25

26

                                   1

1    **I.    Factual Background**

2         **A.    The Underlying Lawsuit**

3         On April 17, 2003, David E. Englert filed a lawsuit against

4    SFPUD in Madera County Superior Court, Case No. MCV 020596.  The

5    complaint in that action (the "Underlying Complaint") contained

6    two causes of action:  for Breach of Contract and for Wrongful

7    Termination in Violation of Public Policy.  The allegations in

8    the Underlying Complaint are as follows.

9         SFPUD employed Mr. Englert as its General Manager, for which

10   Mr. Englert received salary and benefits.  SFPUD led Mr. Englert

11   to believe that he would not be terminated except for good cause.

12   On or about October 17, 2002, SFPUD terminated Mr. Englert

13   without good cause and ceased paying his wages and benefits.

14        Mr. Englert further alleged that over the two years prior to

15   his termination, SFPUD had paid money to Steve Varner and Dennes

16   Coombs.  Mr. Varner and Mr. Coombs did not perform any services

17   or provide SFPUD any benefits in exchange for those payments.

18   Mr. Englert determined that the payments jeopardized the

19   financial stability of SFPUD.  Consequently, he refused to sign

20   any more checks payable to Mr. Varner or Mr. Coombs.  He also

21   withheld support for Mr. Varner's and Mr. Coombs's attempts to

22   control the disbursement of SFPUD funds to its board and to

23   control personnel decisions affecting the operation of Riverbend

24   Golf Course, which SFPUD operated.

25        Riverbend Operations, Inc. ("ROI"), of which Mr. Englert was

26   president, managed SFPUD's facilities.  Mr. Varner was an

1  authorized signatory on a checking account ROI maintained at
2  United Security Bank.  After Mr. Englert refused to authorize the
3  payments, Mr. Varner directed SFPUD or ROI staff to fill out
4  checks payable to himself, which he proceeded to cash.

5      Mr. Varner and Mr. Coombs sought to punish Mr. Englert for
6  his attempts to stop the payments.  SFPUD, by and through its
7  Chairman, Terry Holmes, initiated a campaign of harassment and
8  unwarranted criticism against Mr. Englert.

9      In October of 2002, Mr. Englert provided written notice to
10  United Security Bank indicating that Mr. Varner was not
11  authorized to withdraw funds or sign ROI checks.  Immediately
12  thereafter, SFPUD terminated Mr. Englert.

13      Mr. Englert alleges several instances of misconduct by SFPUD
14  after his termination.  SFPUD falsely accused Mr. Englert of
15  financial improprieties with public funds, publicly disclosed
16  privileged employment matters, refused to return Mr. Englert's
17  personal property, attempted to have Mr. Englert arrested, and
18  circulated false rumors that Mr. Englert would soon be arrested
19  and that he was dishonest.

20      On or about March 19, 2004, Mr. Englert won a judgment of
21  $1,765,943 in the underlying action.  SFPUD appealed the
22  judgment.  At the time of these motions, the appeal was still
23  pending.

24      **B.   The Policy**

25      SFPUD is the named insured under Public Officials Liability
26  Coverage Policy Number HX00001199 (the "Policy") issued by

1   Clarendon.  The Policy was effective from December 28, 2001, to

2   December 28, 2003.  Section I.1 of the Policy provides coverage,

3   in relevant part, as follows:

4           We Agree:
                . . .
5           B.  With the **"Governmental Entity"** that if,
            during the **"policy period,"** any **"claim"** or
6           **"claims"** are first made against the
            **"Insured,"** individually or collectively for a
7           **"wrongful act,"** we will pay in accordance
            with the terms of this policy, and on behalf
8           of the **"Governmental Entity,"** all **"loss"**
            which the **"Governmental Entity"** shall become
9           legally obligated to pay or for which the
            **"Governmental Entity"** may be required by law
10          to indemnify the **"Insured"**; . . . .

11  Sommer Decl. Ex. A (emphasis in original[1]).

12      The Policy, in Section VII.5, defines "Insureds" as

13          those persons acting within the scope of
14          their official duties who were, now are or
            shall be lawfully elected or lawfully
15          appointed officials or members or employees
            or volunteers of the **"Governmental Entity"** or
16          members of commissions, boards, or other
            unites operated by and under the jurisdiction
17          of such **"Governmental Entity"** and within
            apportionment of the total operating budget
18          indicated in the application form, . . . .

19  Id.

20      The Policy, at Section VII.10, defines "wrongful act" as

21          any actual or alleged error or misstatement
22          or act or omission or neglect or breach of
            duty including misfeasance, malfeasance, and
23          nonfeasance by the **"Insured"** in the discharge
            of their **"official duties"** with the

24  _____

25      [1]Terms that the Policy defines in Section VII appear in
    boldface throughout the Policy.  The Court, in all quotations from
26  the Policy, has attempted to reproduce the original emphasis.

                                4

1    "**Governmental Entity,**" individually or
     collectively, or any matter claimed against
2    them solely by reason of their being or
     having been duly elected or appointed
3    officials.

4  Id.

5      The Policy, in Section I.2, also excludes from coverage "ANY

6  'CLAIM' OR 'CLAIMS' BASED UPON OR ATTRIBUTABLE TO:"

7          B.    . . .
                 (3)  wrongful entry or eviction or
8                other invasion of the right of
                 privacy;
9                . . .
           O.    any '**wrongful act**' . . . which shall be
10               deemed uninsurable under the law pursuant to
                 which this policy shall be construed;
11               . . .
           V.    . . . claims by any '**Insured**' against
12         the '**Government Entity.**

13  Id.

14      **C.    The Tender**

15      On or about June 3, 2003, SFPUD tendered the underlying

16  action to Clarendon for defense and indemnification.  The

17  materials SFPUD tendered on that date include the Underlying

18  Complaint; the Management Agreement between SFPUD and ROI;

19  minutes from a Special Board Meeting of SFPUD on October 11,

20  2002; notice to Mr. Englert that SFPUD was terminating ROI's

21  management services, dated October 11, 2002; minutes from SFPUD's

22  Special Board Meeting held October 17, 2002; and SFPUD Board of

23  Directors Resolution 2002-02.  See Enns Decl. Ex. 1.  Clarendon

24  declined defense of SFPUD by letter of June 11, 2003.  See Enns

25  Decl. Ex. 2.

26      On April 5, 2004, after the judgment had been entered in the

5

1  underlying action, SFPUD again tendered the defense, which

2  Clarendon denied in a letter of April 12, 2004.  On May 12, 2004,

3  October 11, 2004, and January 31, 2005, SFPUD sent Clarendon

4  further communications arguing that it had a duty to defend the

5  underlying action.  Clarendon at no point accepted defense of the

6  action.

7  **II.  Procedural History**

8  On May 5, 2005, SFPUD filed a Complaint in the Fresno County

9  Superior Court for Breach of Contract, Breach of the Covenant of

10  Good Faith and Fair Dealing, Fraud, and Declaratory Relief.  On

11  June 7, 2005, Clarendon removed the case to this Court.

12  On March 17, 2006, Clarendon filed its Motion for Summary

13  Judgment.  Clarendon contends that it did not have a duty to

14  defend the underlying action.  Consequently, Clarendon argues,

15  SFPUD's claims for Breach of Contract, Bad Faith, and Fraud also

16  fail as a matter of law.  On March 27, 2006, SFPUD filed is

17  Motion for Partial Summary Judgment as to the Issue of

18  Clarendon's Duty to Defend.

19  **III. Legal Standard**

20  Summary judgment is proper when it is shown that there

21  exists "no genuine issue as to any material fact and that the

22  moving party is entitled to judgment as a matter of law."  Fed.

23  R. Civ. P. 56.  A fact is "material" if it is relevant to an

24  element of a claim or a defense, the existence of which may

25  affect the outcome of the suit.  T.W. Elec. Serv., Inc. v. Pac.

26  Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)

1  (citing <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>,

2  475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

3  Materiality is determined by the substantive law governing a

4  claim or a defense.  <u>Id.</u>  The evidence and all inferences drawn

5  from it must be construed in the light most favorable to the

6  nonmoving party.  <u>Id.</u>

7        The initial burden in a motion for summary judgment is on

8  the moving party.  The moving party satisfies this initial burden

9  by identifying the parts of the materials on file it believes

10 demonstrate an "absence of evidence to support the nonmoving

11 party's case."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325, 106

12 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The burden then shifts to

13 the nonmoving party to defeat summary judgment.  <u>T.W. Elec.</u>, 809

14 F.2d at 630.  Where a court decides cross motions for summary

15 judgment, neither party is entitled to summary judgment if a

16 genuine issue exists as to any material fact.  <u>United States v.</u>

17 <u>Fred A. Arnold, Inc.</u>, 573 F.2d 605, 606 (9th Cir. 1978) (citing

18 Fed. R. Civ. P. 56(c)).

19       The nonmoving party "may not rely on the mere allegations in

20 the pleadings in order to preclude summary judgment," but must

21 set forth by affidavit or other appropriate evidence "specific

22 facts showing there is a genuine issue for trial."  <u>Id.</u> (citing

23 Fed. R. Civ. P. 56(e)).  The nonmoving party may not simply state

24 that it will discredit the moving party's evidence at trial; it

25 must produce at least some "significant probative evidence

26 tending to support the complaint."  <u>Id.</u> (citing <u>First Nat'l Bank</u>

1  v. Cities Serv. Co., 391 U.S. 253, 290, 88 S. Ct. 1575, 20 L. Ed.

2  2d 569 (1968)).

3  **IV.   SFPUD's Motion for Summary Judgment**

4      **A.   An Insurer's Duty to Defend**

5      A liability insurer has a broad duty to defend the insured

6  against claims that create a potential for indemnity.  Montrose

7  Chem. Corp. v. Super. Ct., 6 Cal. 4th 287, 295 (1993).  This

8  means that "the carrier must defend a suit which *potentially*

9  seeks damages within the coverage of the policy."  Id. (quoting

10 Horace Mann Ins. Co. v. Barbara B., 4 Cal. 4th 1076, 1081

11 (1993)).  Hence, the duty to defend is broader than the duty to

12 indemnify, sometimes requiring that an insurer defend the insured

13 even in an action in which no damages are awarded.  Id. (citing

14 Horace Mann, 4 Cal. 4th at 1081).

15     The first step to determine whether the insurer has a duty

16 to defend is to compare the allegations of the complaint with the

17 terms of the policy.  Id. (citing Horace Mann, 4 Cal. 4th at

18 1081).  Facts outside the complaint may also be relevant where

19 they reveal that a possibility exists that the claim may be

20 covered by the policy.  Id. (citing Horace Mann, 4 Cal. 4th at

21 1081).  These facts outside the complaint can trigger a duty to

22 defend "even though the face of the complaint does not reflect a

23 potential for liability under the policy."  Id. at 296 (citing

24 Gray v. Zurich Ins. Co., 65 Cal. 2d 263, 276 (1966)).  This is

25 because, in light of pleading rules allowing liberal amendment,

26 the third party plaintiff should not be the arbiter of coverage.

1  <u>Id.</u> (citing <u>Gray</u>, 65 Cal. 2d at 276).  "The scope of the duty [to
2  defend] does not depend on the labels given to the causes of
3  action in the third party complaint; instead it rests on whether
4  the alleged facts or known extrinsic facts reveal a possibility
5  that the claim may be covered by the policy." <u>Cunningham v.</u>
6  <u>Universal Underwriters</u>, 98 Cal. App. 4th 1141, 1148 (2002).  The
7  insured is entitled to a defense if facts in the complaint and in
8  other materials tendered to the insurer indicate that "the
9  complaint might be amended to give rise to a liability that would
10 be covered under the policy." <u>Montrose</u>, 6 Cal. 4th at 299
11 (citing <u>Gray</u>, 65 Cal. 2d at 275-76).

12      California courts resolve in the insured's favor any doubts
13 as to whether the facts establish the insurer's duty to defend.
14 <u>Id.</u> at 299-300.  "[T]he insurer need not defend if the third
15 party complaint *can by no conceivable theory raise a single issue*
16 *which could bring it within the policy coverage.*" <u>Id.</u> at 300
17 (quoting <u>Gray</u>, 65 Cal.2d at 276 n. 15) (<u>Montrose</u>'s emphasis).
18 This means that, to prevail, "the insured need only show that the
19 underlying claim *may* fall within policy coverage; the insurer
20 must prove it *cannot*." <u>Id.</u> (<u>Montrose</u>'s emphasis)  Facts that
21 merely tend to show that the claim is not covered, or is unlikely
22 to be covered, do not eliminate the possibility that the action
23 will fall within a policy's coverage and "therefore add no weight
24 to the scales." <u>Id.</u>  On the other hand, the duty to defend "may
25 exist even where coverage is in doubt and ultimately does not
26 develop." <u>Id.</u> at 295.

1    To prevail in demonstrating that it does not have a duty to
2    defend, Clarendon must present "evidence that the underlying
3    claim cannot come within the policy coverage by virtue of the
4    scope of the insuring clause or the breadth of an exclusion."
5    Id. at 301.  The duty to defend also extends to claims that are
6    not covered, so long as any claim discloses the potential for
7    liability under the policy.  Rosen v. Nations Title Ins. Co., 56
8    Cal. App. 4th 1489, 1496-97 (1997).

9    **B.   Interpreting Insurance Contracts**

10   California courts construe insurance contracts, like
11   contracts generally, to give effect to the mutual intentions of
12   the parties.  Boghos v. Certain Underwriters at Lloyds of London,
13   36 Cal. 4th 495, 501 (2005).  Contractual language governs where
14   it is "clear and explicit."  Id. (quoting Bank of the W. v.
15   Super. Ct., 2 Cal. 4th 1254, 1264 (1992)).  Ambiguous terms are
16   interpreted to protect the "'objectively reasonable expectations
17   of the insured.'"  Bank of the W., 2 Cal. 4th at 1265 (quoting
18   AIU Ins. Co. v. Super. Ct., 51 Cal. 3d 807, 822 (1990)).

19   Insurance policies are written in two parts:
20   "an insuring agreement which defines the type of risks being
21   covered, and exclusions, which remove coverage for certain risks
22   which are initially within the insuring clause."  Rosen, 56 Cal.
23   App. 4th at 1497.  A court first construes coverage provision to
24   determine whether they extend to the claim at issue.  Id.  If a
25   claim falls within the coverage provisions but also within an
26   exclusion, the policy does not cover the claim.  Id.

10

1    **C.    Potential Coverage Based on Conversion**

2        SFPUD claims that the Underlying Complaint and the materials

3    it tendered on June 3, 2003, contain facts that present potential

4    for covered liability for conversion:

5             Conversion is the wrongful exercise of
              dominion over the property of another.  The
6             elements of a conversion are the plaintiff's
              ownership or right to possession of the
7             property at the time of the conversion; the
              defendant's conversion by a wrongful act or
8             disposition of property rights; and damages.
              It is not necessary that there be a manual
9             taking of the property; it is only necessary
              to show an assumption of control or ownership
10            over the property, or that the alleged
              converter has applied the property to his own
11            use.

12   Farmers Ins. Exch. v. Zerin, 53 Cal. App. 4th 445, 451-52 (1997).

13   A person who refuses to return the property of another or who

14   prevents another from retrieving his property can be liable for

15   conversion.  Gruber v. Pac. States Sav. & Loan Co., 13 Cal. 2d

16   144, 147 (1939) (holding that landlord was liable for conversion

17   where it refused to allow tenant access to his personal

18   property); see also Price v. Hovsepian, 114 Cal. App. 2d 385, 388

19   (1952) (defendant who locked plaintiffs out of an apartment

20   containing their property could be liable for conversion).

21       The Underlying Complaint alleges that "[f]ollowing [Mr.

22   Englert]'s termination, SFPUD . . . refused to return Plaintiff's

23   personal property, . . . ."  Clarendon's Request for Judicial

24   Notice ("RJN") Ex. 1 at 5.  This allegation appears under the

25   heading "Second Cause of Action for Wrongful Termination in

26   Violation of Public Policy."  Clarendon's RJN Ex. 1 at 4-5.  The

                                    11

1  language appears to state a claim for conversion under California

2  law.  It indicates that the property in question belonged to Mr.

3  Englert and that SFPUD denied him access to it in retaliation for

4  the manner in which he performed his duties as General Manager.

5        **1.  Coverage of Claims Where SFPUD is Sole Defendant**

6        Clarendon contends that Mr. Englert's claims against SFPUD

7  are not potentially covered by the Policy because they are not

8  claims against an "Insured."  Section I.1 of the Policy provides

9  coverage for "any **'claim'** or **'claims'** are first made against the

10 **'Insured,'** individually or collectively for a **'wrongful act.'"**

11 Sommer Decl. Ex. A.  In such a case, Clarendon promises to "pay

12 in accordance with the terms of this policy, and on behalf of the

13 **'Governmental Entity,'** all **'loss'** which the **'Governmental Entity'**

14 shall become legally obligated to pay or for which the

15 **'Governmental Entity'** may be required by law to indemnify the

16 **'Insured.'"**  Id.  Under Section VII.5, "Insureds" are "those

17 persons acting within the scope of their official duties who

18 were, now are or shall be lawfully elected or lawfully appointed

19 officials or members or employees or volunteers of the

20 **'Governmental Entity'** . . . ."  Id.

21        Clarendon argues that the Underlying Complaint cannot

22 trigger coverage under the Policy because only SFPUD was named a

23 defendant, but not any of its officials, members, employees, or

24 volunteers (collectively "Insureds").  In support, Clarendon

25 cites Olympic Club v. Those Interested Underwriters at Lloyd's

26 London (Olympic Club), 991 F.2d 497, 502-04 (9th Cir. 1993).

1   That case involved interpretation of a Director's and Officer's

2   Liability Policy that required the insurer to pay all "loss"

3   arising from claims based on the policyholder entity's directors'

4   and officers' "wrongful acts."  Id. at 499.  The court held that

5   coverage would turn on "whether the underlying lawsuits are

6   against the [entity] for the [entity]'s own policies, or are

7   against the [entity] because of 'wrongful acts' of its directors

8   and employees that are 'imputed to [the entity] as their

9   principal.'"  Id. at 500.  The court determined that the

10  underlying claims sought relief solely based on longstanding

11  policies of the entity.  Id.  The underlying claims did not

12  allege that the directors and employees themselves had committed

13  any "wrongful acts."  Id.

14      Even if the Policy here functions similarly to that in

15  Olympic Club, coverage does not properly turn on whether any

16  Insured is named as a defendant in the Underlying Complaint, as

17  Clarendon contends.  The Olympic Club court looked past the

18  absence of a named officer defendant to determine whether the

19  underlying lawsuits alleged the requisite "wrongful act" under

20  the Policy.  Id.  Similarly here, an analysis of the wrongful

21  acts and the actors alleged to have committed them is necessary.

22      Clarendon's reading of the Policy appears to interpret the

23  phrase "any 'claim' or 'claims' are first made against the

24  'Insured'" to refer only to causes of action naming an Insured as

25  defendant.  See Sommer Decl. Ex. A.  This reading, however, is

26  doubtful in light of the Policy's definition of "claim":

13

1   "'**Claim**' means a demand for '**damages**' received by the

2   '**Governmental Entity**' or the '**Insured**' *including the service of*

3   '***suit***' or institution of arbitration proceedings *against the*

4   '***Governmental Entity***' or the '**Insured**.'"   Id. (italics added).

5   Inserting the relevant portions of this definition of "claim"

6   into the coverage language reads as follows:   "any [demand for

7   '**damages**' received by the '**Governmental Entity**' or the '**Insured**'

8   including the service of '**suit**' is] first made against the

9   '**Insured**.'"   The clause concerning the "demand for '**damages**'

10  received by the '**Governmental Entity**'" has no meaning if the

11  "first made against the '**Insured**'" restricts coverage to lawsuits

12  naming an Insured as defendant.

13      Clarendon's reading also causes the Court to wonder what

14  effect remains for the language in Section I.1 indicating that

15  Clarendon will pay according to the terms of the Policy "all

16  '**loss**' which the '**Governmental Entity**' shall become legally

17  obligated to pay."   Id.   Furthermore, as defined in Section VII.6

18  of the Policy, "loss" includes "any amount which the

19  '**Governmental Entity**' or the '**Insured**' is legally obligated to

20  pay as '**damages**,' . . . ."   Sommer Decl. Ex. A.   It does not

21  appear that SFPUD could have a legal obligation to pay "damages,"

22  a term defined in Section VII.3 as "compensatory money damages

23  only," on a claim brought against one of its Insureds.   See id.

24      Moreover, Exclusion V contains language that specifically

25  excludes coverage for "claims by any '**Insured**' against the

26  '**Government Entity**.'"   Id.   Such an exclusion would be

14

1  unnecessary if only claims naming Insured as defendant fall

2  within the definition of coverage and those brought against the

3  "Government Entity" fall outside.[2]

4       A more plausible reading of Section I.1 requires an inquiry,

5  similar the analysis in the <u>Olympic Club</u> case Clarendon cites,

6  into whether the underlying action seeks to recover based on a

7  "wrongful act" of one of SFPUD's Insureds.  Clarendon does not

8  explain why a claim cannot be "against" someone for his wrongful

9  act unless he is a defendant in the lawsuit that arises

10 therefrom.  Rather, it seems logically possible to classify a

11 lawsuit naming a public entity as a defendant and alleging

12 misconduct by an officer of that entity to be a claim against the

13 officer.  Given the dissonance between Clarendon's reading and

14 the other language of the Policy, accepting the latter

15 explanation is better than foreclosing it.  Under such a reading,

16

17      [2]At oral argument, Clarendon contended that these provisions
   referring to SFPUD's own liability have meaning because they refer
18 to coverage of SFPUD for suits by Insureds against SFPUD seeking
   indemnity.  Clarendon contended that, for instance, the definition
19 of "loss" included the language "any amount which the **'Governmental
   Entity'** . . . is legally obligated to pay as **'damages'**" to indicate
20 that indemnity actions against SFPUD are covered.  The passage,
   however, refers to amounts that SFPUD is "legally obligated to pay"
21 separately from amounts it must pay to indemnify Insureds: "**'Loss'**
   shall mean any amount which the **'Governmental Entity'** or the
22 **'Insured'** is legally obligated to pay as **'damages,'** *or for which
   the **'Governmental Entity'** is required to indemnify the **'Insured,'***
23 . . . ."  Sommer Decl. Ex. A (italics added).  If both clauses are
   to retain meaning, the Policy must be read cover amounts that SFPUD
24 is legally obligated to pay other than amounts it is required to
   pay to indemnify an Insured.  <u>See</u> Cal. Civ. Code § 1641 ("The whole
25 of a contract is to be taken together, so as to give effect to
   every part, if reasonably practicable, each clause helping to
26 interpret the other.").

                                    15

defining whether a claim is "first made against the **'Insured'**

. . . for a **'wrongful act'**" turns on whom plaintiff alleges to

have committed the wrongful act, rather than on which name

appears in the caption or the heading of the cause of action.

In <u>Toledo-Lucas County Port Authority v. Axa Marine &</u>
<u>Aviation Insurance (UK), Ltd.</u>, 368 F.3d 524 (6th Cir. 2004), the
court interpreted a Public Officials Liability policy that
covered claims for certain types of misconduct "by an officer
and/or commissioner and/or employee and/or committee member in
the discharge of his/her duties as such and ***claimed against***
***him/her*** solely by reason of his/her capacity as such with a port
or harbor commission named herein."   <u>Id.</u> at 527 (emphasis added).
The court read that language to require the insurer to defend and
indemnify claims against the insured public entity based on its
employees' acts.   <u>Id.</u> at 533.   The court described the general
nature of public officials liability policies, like the one at
issue in this case:   "Public Officials Liability coverage,
accordingly, does not necessarily require a claim or demand to be
made against an individual employee; a claim or demand against
the [entity] for damages on account of an individual employee's
wrongdoing solely in his or her capacity as [the entity's]
employee will suffice."   <u>Id.</u>; <u>see also</u> <u>City of Flint v. Lexington</u>
<u>Ins. Co.</u>, 293 F.3d 956, 958 (6th Cir. 2002) ("Public Officials
and Employees Liability Insurance Policy" covered suit against
insured entity only).

Had the parties intended to restrict coverage to suits in

16

1   which  officials, members, employees, or volunteers were

2   defendants, they could have done so with direct explicit language

3   to that effect.  Toledo-Lucas, 368 F.3d at 531.  Instead, they

4   included language that explicitly contemplated coverage for

5   claims made in lawsuits filed against SFPUD.  The Court finds

6   that the phrase limiting coverage to "any **'claim'** or **'claims'** are

7   first made against the **'Insured'**" does not preclude coverage of

8   causes of action in which only SFPUD is a defendant.

9                   **2.   Wrongful Act of an Insured**

10       Coverage under the Policy turns, not on whom the Underlying

11  Complaint names as defendant, but instead on whether the conduct

12  alleged constitutes a wrongful act by an Insured – an officer,

13  member, employee, or volunteer of SFPUD.  See Olympic Club, 991

14  F.2d at 500.  Under Section VII.10 of the Policy, a "wrongful

15  act" is

16              any actual or alleged error or misstatement
             or act or omission or neglect or breach of
17           duty including misfeasance, malfeasance, and
             nonfeasance by the **"Insured"** in the discharge
18           of their **"official duties"** with the
             **"Governmental Entity,"** individually or
19           collectively, or any matter claimed against
             them solely by reason of their being or
20           having been duly elected or appointed
             officials.

21

22  Sommer Decl. Ex. A.

23       Clarendon does not address whether any of SFPUD's Insureds

24  engaged in the conduct giving rise to the allegations of

25  conversion in the Underlying Complaint.  The Underlying Complaint

26  states that "SFPUD, by and through its Chairman Terry Holmes,

17

initiated a campaign of harassment and unwarranted criticism against Plaintiff in the performance of his duties as General Manager." Clarendon's RJN Ex. 1 at 4. The next paragraph contains the facts supporting a claim for conversion: "[f]ollowing [Mr. Englert]'s termination, SFPUD . . . refused to return Plaintiff's personal property, . . . ." Clarendon's RJN Ex. 1 at 4. The actor in that paragraph is simply "SFPUD." The language does not explicitly state that this action was performed "by and through" any Insured.

Nevertheless, this language shows that there is potential that SFPUD will face covered liability in the underlying action. The language stating that Chairman Terry Holmes, an officer of SFPUD, had initiated the harassment campaign indicates that Mr. Englert is likely contending that SFPUD was acting through Mr. Holmes when it refused to return the property. Even if the allegation is not that Mr. Holmes refused to return the property, the allegation, if true, tends to show, and may even logically necessitate, that an Insured committed a wrongful act. In any event, Clarendon must prove that, based on the information tendered, conduct on which the Underlying Complaint is based cannot possibly give rise to covered liability. The Underlying Complaint raises the possibility that an Insured, and not simply SFPUD, committed a wrongful act giving rise to the tort of conversion.

### 3.   Failure to "Advise" or Request Reconsideration

Clarendon further contends that SFPUD "never advised"

18

1   Clarendon that a claim for conversion triggered its duty to

2   defend and did not "seek reconsideration" of Clarendon's denial

3   on this basis.  Clarendon's Opp'n 35:12-18.  SFPUD's role in

4   determining whether a potential coverage triggers a duty to

5   defend ends when it submits materials demonstrating a potential

6   for coverage.  See Montrose, 6 Cal. 4th at 295-96.  Any failure

7   of SFPUD to guide Clarendon in Clarendon's interpretation of

8   those materials does not impair SFPUD's right to a defense in the

9   case that the tendered materials demonstrate a potential for

10  covered liability.

11      The insurer determines at the inception of the third party

12  lawsuit whether the duty to defend exists "by reference to the

13  policy, the complaint and *all* facts known to the insurer from any

14  source."  Safeco Ins. Co. of Am. v. Parks (Parks), 122 Cal. App.

15  4th 779, 791 (2004) (quoting Gray, 65 Cal. 2d at 300) (emphasis

16  in original).  "The risk that an insurer takes when it denies

17  coverage without investigation is that the insured may later be

18  able to prove that a reasonable investigation would have

19  uncovered evidence to establish coverage or a potential for

20  coverage."  Am. Int'l. Bank v. Fid. & Deposit Co., 49 Cal. App.

21  4th 1558, 1571 (1996).  The only duty that California courts

22  place on the insured is to tender to the insurer the complaint

23  and any extrinsic facts that show a potential for coverage.

24  Montrose, 6 Cal. 4th at 295.  Doing so triggers the duty to

25  defend until "it has been shown that there is *no* potential for

26  coverage."  Id. (emphasis in original).

19

1   Forcing the insurer, rather than the insured, to perform the

2   legwork of thoroughly examining the tendered evidence, underlying

3   complaint, and policy comports with the relative expertise of the

4   parties and with the policy behind the duty to defend.  The

5   insurer is likely more familiar with the law concerning coverage

6   and is undoubtedly more familiar with the terms of the policy.

7   This puts the insurer in a better position than the insured to

8   determine how the underlying complaint or tendered materials may

9   trigger the potential for coverage.  Moreover, requiring the

10  insured to correctly interpret the manner in which the complaint

11  and extrinsic evidence might trigger coverage under the policy

12  practically necessitates that the insured retain legal counsel

13  for this purpose.  This necessity undermines the insured's

14  "significant" motive for purchasing insurance:  "the right to

15  call upon the insurer's superior resources" to ameliorate

16  potential legal expenses.  See Montrose, 6 Cal. 4th at 295-96.

17  Accordingly, SFPUD's failure to advise Clarendon that Mr.

18  Englert made a claim for conversion or to request reconsideration

19  of Clarendon's denial on that basis does not affect Clarendon's

20  duty to defend.

21  **4.   Duty to Defend Unpled Claims**

22  Clarendon argues that the absence of a claim for conversion

23  in the Underlying Complaint militates against a finding that

24  SFPUD potentially faced covered liability for such a claim.

25  Clarendon asserts that it is not required to speculate about

26  claims that Mr. Englert did not plead.  In support, Clarendon

20

1  cites Gunderson v. Fire Insurance Exchange (Gunderson), 37 Cal.

2  App. 4th 1106, 1114 (1995).

3      At issue in Gunderson was whether the insured had

4  established a potential for covered liability under a policy

5  covering "property damage," defined as "physical injury to or

6  destruction of tangible property, including loss of its use."

7  Id. at 1115.  The complaint featured no claims for property

8  damage but merely sought injunctive and declaratory relief

9  regarding an easement.  Id.  The insured contended that certain

10  extrinsic evidence, including a series of letters to insured from

11  counsel for the underlying plaintiff and discovery requests in

12  the underlying case, demonstrated a potential coverage.  Id.

13  None of the extrinsic evidence was ever tendered to the insurer.

14  Id. at 1117.  The court rejected the insured's argument that the

15  underlying plaintiff might have amended her complaint to state a

16  claim for property damage.  Id.

17      It does not appear that the court in Gunderson intended its

18  holding to contradict or question the well-established rule that

19  the insurer may be required to defend in circumstances where "the

20  complaint might be amended to give rise to a liability that would

21  be covered under the policy."  Montrose, 6 Cal. 4th at 299

22  (citing Gray, 65 Cal. 2d at 275-76).  The court in Gunderson held

23  that "[a]n insured may not trigger the duty to defend by

24  speculating about extraneous 'facts' regarding potential

25  liability or ways in which the third party claimant might amend

26  its complaint at some future date."  Gunderson, 37 Cal. App. 4th

at 1114 (emphasis added).  This admonition is consistent with the Supreme Court of California's directive in <u>Montrose</u> that the insurer need only consider the facts in the complaint and in any other materials the insured tenders.  6 Cal. 4th at 295-96. Nothing in <u>Gunderson</u> relieves the insurer of its duty to defend a lawsuit alleging facts that demonstrate a potential for liability simply based on the causes of action the complaint contains. Here, as discussed above, the Underlying Complaint contains facts that support a claim for conversion.  The absence of a cause of action labeled "conversion" does not affect Clarendon's duty to defend.

### 5.    Insured-Versus-Government-Entity Exception

Clarendon contends that no potential for coverage existed because Mr. Englert was an employee of SFPUD and, as such, his claims were excluded under Policy Section I.2.V's Insured-versus-Government-Entity exclusion ("Exclusion V").

SFPUD contends that the materials it tendered to Clarendon in the letter of June 3, 2003, establish that Mr. Englert's claims triggered a duty to defend under the Policy based on his potential status as an independent contractor.

The parties do not dispute that the Underlying Complaint indicates that Mr. Englert was "employed" by SFPUD.  SFPUD's Opp'n 21:4-6; <u>see</u> Clarendon's RJN Ex. 1 at 3-4.  Neither party contends that this language is dispositive as to whether Mr. Englert is an Insured, triggering Exclusion V.  The terminology in an agreement between a worker and the party for whom the work

22

1  is performed "is not conclusive" as to the nature of their

2  relationship.  See Kowalski v. Shell Oil Co., 23 Cal. 3d 168, 176

3  (1979).  It follows that Mr. Englert's unilateral

4  characterization of the relationship in the Underlying Complaint

5  is not determinative of his employment status.

6       The parties vigorously dispute whether the materials

7  tendered along with the Underlying Complaint on June 3, 2003,

8  demonstrate that Exclusion V applies.  SFPUD contends that the

9  tendered materials demonstrate that a possibility exists that Mr.

10 Englert was an independent contractor and therefore not an

11 Insured under Exclusion V.  Clarendon does not argue that

12 Exclusion V would still apply in the case that Mr. Englert was an

13 independent contractor under California law.

14      The Supreme Court of California enumerated factors to

15 consider in determining whether an individual performing a

16 service is an employee or an independent contractor in S. G.

17 Borello & Sons, Inc. v. Department of Industrial Relations, 48

18 Cal. 3d 341 (1989).  The most significant factor concerns whether

19 that individual has the right to control the details of his work.

20 Id. at 350.  The right of the party for whom the service is

21 performed to discharge the worker at will without cause is also

22 strong evidence of an employment relationship.  Id.  Additional

23 factors to consider include the following:

24               (a) whether the one performing services is
                 engaged in a distinct occupation or business;
25               (b) the kind of occupation, with reference to
                 whether, in the locality, the work is usually
26               done under the direction of the principal or

1                     by a specialist without supervision; (c) the
skill required in the particular occupation;
2                     (d) whether the principal or the worker
supplies the instrumentalities, tools, and
3                     the place of work for the person doing the
work; (e) the length of time for which the
4                     services are to be performed; (f) the method
of payment, whether by the time or by the
5                     job; (g) whether or not the work is a part of
the regular business of the principal; and
6                     (h) whether or not the parties believe they
are creating the relationship of
7                     employer-employee.

8   Id. at 351.

9     Under the Management Agreement (the "Agreement"), a copy of

10   which SFPUD tendered to Clarendon, ROI agreed with SFPUD to

11   manage the Riverbend Golf Club.  Enns Decl. Ex. 1.  The

12   Agreement, on page 45, is signed by Mr. Englert as "President" of

13   ROI.  Id.  The Agreement provides, on page 7, that ROI, as

14   Operator, with the approval of SFPUD "shall have the authority

15   and responsibility to . . . hire, train, and supervise the

16   general manager . . . ."  Id.  The Agreement also provides, on

17   pages 10 and 11, that ROI will submit for SFPUD's approval an

18   "Annual Plan" including a budget that details employee

19   compensation.  Id.  The "Annual Plan" also included "[a]n

20   operating business plan for the Facility setting forth a

21   marketing and promotions plan, a schedule of proposed golf

22   charges, an operating schedule . . . and a maintenance plan."

23   Id.

24     The facts do not foreclose the possibility that Mr. Englert

25   was not an Insured under the Policy, but was instead an

26   independent contractor.  The Agreement indicates that ROI, of

24

which Mr. Englert was president, has a central role in
supervising the General Manager position that Mr. Englert held.
ROI, not SFPUD, had primary responsibility for drafting the
Annual Plan governing compensation and business operations.
These details signal a significant degree of autonomy from SFPUD
in the manner in which ROI and Mr. Englert carried out management
duties.

The other materials that SFPUD originally tendered are not
as descriptive as the Agreement, but do tend to show that the
relationship between Mr. Englert and SFPUD paralleled the
relationship of ROI and SFPUD.  The minutes of the SFPUD Special
Board Meeting on October 11, 2002, list as a single
"Consideration/action," SFPUD's "Termination of Riverbend
Operations, Inc., and David E. Englert as Interim General Manager
of the Sierra Foothills Public Utility District ('SFPUD')."  Enns
Decl. Ex. 1.  The notice to Mr. Englert that SFPUD was
terminating ROI's services, dated October 11, 2002, and the
minutes from SFPUD's Special Board Meeting held October 17, 2002,
also indicate that SFPUD viewed its relationship to Mr. Englert
as closely linked to its relationship to ROI.  Enns Decl. Ex. 1.

Since SFPUD prevails if it can merely "show that the
underlying claim *may* fall within policy coverage," Clarendon
faces a difficult task at this stage.  See Montrose, 6 Cal. 4th
at 300.  Clarendon does not argue that the Underlying Complaint
and the other materials initially tendered foreclose the
possibility that Mr. Englert was an independent contractor.  The

25

1  strongest statement Clarendon makes about the materials initially
2  tendered is that "the totality of the circumstances was that
3  Englert was suing in his individual capacity as a former employee
4  of SFPUD." Clarendon's Opp'n 20:17-18. Such facts that merely
5  tend to show that SFPUD's claim is not covered, without
6  foreclosing the possibility of coverage, have no weight in a
7  determination of duty to defend. See Montrose, 6 Cal. 4th at
8  300.

9     Clarendon appears to place the burden on SFPUD to explicitly
10 enunciate the reason that the claims were potentially covered.
11 Clarendon points out that SFPUD never told Clarendon that failing
12 to provide a defense "was improper because Englert was not an
13 employee of SFPUD." Clarendon's Opp'n 20:28-21:2. Clarendon
14 continues, "After the denial letter was sent, moreover, SFPUD
15 never requested reconsideration by CLARENDON informing CLARENDON
16 that the documents it provided in any way demonstrated Englert
17 was not its former employee as General Manager." Clarendon's
18 Opp'n 21:2-5.

19    It appears that Clarendon would have the Court deny SFPUD
20 its defense, despite tendering facts that demonstrate the
21 possibility that Mr. Englert's claims fell outside Exclusion V.
22 Clarendon does not cite, nor is the Court aware of, any authority
23 that requires an insured to assist the insurer in applying the
24 extrinsic evidence to the policy to determine whether coverage is
25 possible. Such a burden on the insured would be inconsistent
26 with the duty of an insurer to compare the claims in the

26

1  complaint and any other facts before it with the terms of the

2  policy to determine whether coverage is appropriate.  <u>See</u> <u>Gray</u>,

3  65 Cal. 2d at 276; <u>Montrose</u>, 6 Cal. 4th at 300.  The Court

4  therefore finds it irrelevant that SFPUD did not assert that Mr.

5  Englert was an independent contractor rather than an employee at

6  the time of the initial tender or following Clarendon's denial of

7  the defense.

8       Clarendon argues that this case is analogous to <u>Parks</u>, where

9  a California Court of Appeal found that the evidence tendered to

10  the insurer did not trigger a duty to defend.  122 Cal. App. 4th

11  at 791.  In that case, potential coverage, and consequently the

12  duty to defend, turned on whether the underlying defendant was an

13  insured by virtue of being a member of the policyholder's

14  household.  <u>Id.</u> at 784.  No evidence was available to the insurer

15  indicating that the underlying defendant was a member of the

16  household.  <u>Id.</u> at 793-94.

17       Instead, the policyholder, the underlying defendant, and

18  another resident represented to the insurer and to law

19  enforcement that the underlying defendant was not a member of the

20  household.  <u>Id.</u> at 792.  The policyholder, the other resident,

21  and the underlying defendant did not disclose evidence tending to

22  show a familial relationship, such as evidence that the

23  policyholder disciplined the underlying defendant or provided her

24  with financial support.  <u>Id.</u> at 793.  The underlying defendant

25  listed the policyholder's residence on her vehicle registration

26  and some tax documents, but no one informed the insurer of those

27

1   facts.  _Id._ at 792.  Because the residents and the underlying

2   defendant presented a "united front" to the insurer in denying

3   her status a member of the household, the undisputed facts

4   established that the underlying defendant was not insured under

5   the policy.  _Id._ at 793-94.  Consequently, the insurer did not

6   have a duty to defend.  _Id._ at 794.

7        The initial tender in this case is distinguishable from that

8   in _Parks_.  In _Parks_, all of the evidence tendered indicated that

9   the claims were undisputedly not covered by the policy.  _Id._ at

10   794.  In addition, the insured herself affirmatively asserted,

11   both to the insurer and to law enforcement, that no facts that

12   might trigger coverage existed.  _Id._ at 792.  Here, SFPUD merely

13   tendered to Clarendon evidence that described Mr. Englert's

14   claims and his relationship to SFPUD.  _See_ Enns Decl. Ex. 1.  At

15   the time of tender, SFPUD did not attempt to characterize Mr.

16   Englert as an employee or as an independent contractor.  It

17   merely left that determination, and the determination of

18   potential coverage, up to Clarendon.

19        In this case, the evidence of coverage was not one-sided as

20   it was in _Parks_.  Here, the determination of whether Mr. Englert

21   was an employee and hence was an Insured appears to require a

22   complex analysis of a variety of facts.  _See_ S. G. Borello, 48

23   Cal. 3d at 351.  Evidence that SFPUD tendered indicated that

24   primary responsibility for supervising Mr. Englert and

25   determining the manner in which he carried out his duties may

26   have fallen to ROI, a company of which Mr. Englert was president,

1   rather than to SFPUD.  These facts indicated that the most

2   significant factor in determining independent contractor status,

3   that is, whether an individual has the right to control the

4   details of his work, might weigh against a decision that Mr.

5   Englert was an employee.  Id. at 350.  Nevertheless, Clarendon

6   denied SFPUD a defense on the basis that Mr. Englert was an

7   employee.  In effect, this denial amounted to Clarendon's

8   assertion that, based on the evidence before it, Mr. Englert

9   could not possibly be an independent contractor.  The evidence

10  SFPUD initially tendered at least signaled a possibility that Mr.

11  Englert was an independent contractor and, as such, not subject

12  to Exclusion V.  The Court finds that, as a matter of law,

13  Clarendon's decision that the materials tendered did not indicate

14  a possibility that Mr. Englert was an independent contractor was

15  incorrect.  Accordingly, a claim of conversion by Mr. Englert can

16  trigger Clarendon's duty to defend notwithstanding Exclusion V.

17      Because the Underlying Complaint and the other materials

18  tendered establish that SFPUD potentially faced covered liability

19  for conversion based on Mr. Englert's claims, the Court finds, as

20  a matter of law, that Clarendon had a duty to defend SFPUD as of

21  the tender of June 3, 2003.[3]

22  _____

23      [3]SFPUD asserts that Clarendon's investigation of the claim was
    inadequate because it failed to obtain and consider in its denial
    certain correspondence mentioned in the Underlying Complaint or
24  consider Mr. Englert's Internal Revenue Service Form 1099.  SFPUD
    also contended that communications it sent after June 3, 2003,
25  indicate that Clarendon had a duty to defend.  Additionally, SFPUD
    claims that it potentially faced covered liability for claims based
26  on wrongful termination and invasion of privacy.  Because the Court

**V.   Clarendon's Motion for Summary Judgment**

Clarendon seeks summary adjudication that Clarendon did not have a duty to defend SFPUD against Mr. Englert's claim as of June 3, 2003.  Clarendon also sought summary judgment on SFPUD's breach of contract, bad faith, and fraud claims, based on the absence of its duty to defend.  SFPUD has shown that Clarendon had a duty to defend as a matter of law.  Accordingly, Clarendon's motion for summary judgment is denied.

**ACCORDINGLY:**

1.   SFPUD's Motion for Partial Summary Judgment as to the Issue of Clarendon's Duty to Defend is GRANTED.

2.   Clarendon's Motion for Summary Judgment is DENIED.


IT IS SO ORDERED.

**Dated:  May 16, 2006**              ___/s/ Robert E. Coyle___
810ha4                                UNITED STATES DISTRICT JUDGE

---

finds that the materials SFPUD tendered on June 3, 2003, establish a potential for coverage of a claim for conversion as a matter of law, it need not consider other arguments in favor of the potential for coverage.  Furthermore, because none of the evidence to which Clarendon objects bears on the Court's findings, the Court need not decide the merits of the objections.

30